UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  05-61559-CIV-MARRA/SELTZER

FEDERAL TRADE COMMISSION,

       Plaintiff,

vs.

TRANSNET WIRELESS CORPORATION,
       a Florida corporation, et al.

       Defendants.

_____/

## ORDER AND OPINION GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

_____THIS CAUSE is before the Court upon Plaintiff Federal Trade Commission's Motion for

Summary Judgment, (DE 89), filed on June, 2, 2006.  On August 9, 2006, the Court granted (DE

113) Defendant Bradley Cartwright's Motion for Extension of Time to File an Opposition to

Plaintiff's Motion for Summary Judgment (DE 109).  In that order, the Court advised the *pro se*

Defendants that the Court would being considering Plaintiff's Motion on September 8, 2006.

The Court also instructed Defendants on how to respond to a motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56.  The Court cautioned Defendants that failure to

file a response would result in the Court accepting all material facts set forth in the Motion as

true, provided there is record support.  A review of the record reveals that Defendants have not

filed a response to Plaintiff's Motion for Summary Judgment.[1]  Accordingly, the matter is now

_____

[1]    Defendant Farris Pemberton submitted a letter addressed to the undersigned,
denying generally any wrongdoing.  In the letter, Mr. Pemberton asserts that his role in the
'operations' were limited as serving as a monitor on Paul Pemberton's second shift to assure
employees were following their telephone scripts.  The letter is vague and does not identify the

ripe for review.  The Court has carefully considered the motion, the pertinent parts of the record and is otherwise fully advised in the premises.

## I.      Background

On September 26, 2005, the Federal Trade Commission ("FTC") filed a two-count Complaint against Transnet Wireless Corporation ("Transnet"), Nationwide Cyber Systems, Inc. ("Nationwide"), Paul Pemberton, Farris Pemberton, Bradley Cartwright and Margaret Pemberton, asserting claims for unfair or deceptive acts and practices in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and failure to disclose in violation of the FTC's Franchise Rule, 16 C.F.R. Part 436.  (Compl. ¶ 1.)  The FTC simultaneously moved ex parte for a temporary restraining order, which this Court granted.  (DE 21.)  After the conclusion of discovery, Plaintiff's instant motion for Summary Judgment followed.

The facts, as culled from the complaint, affidavits[2], depositions, exhibits, consumer complaints[3], and adverse inferences[4], and reasonably inferred therefrom in a light most favorable

---

'operations.' Moreover, it is unsworn and insufficient to create a genuine issue of material fact as to matters asserted by Plaintiff which are supported by record evidence. Fed. R. Civ. P. 56(e).

[2]      The FTC complied affidavits from thirty one consumer declarants who purchased kiosks from Defendants.

[3]      All of the consumer complaints in the record come from the thirty one declarants that submitted affidavits.  Plaintiff filed a motion in limine (DE 94) to admit over two hundred consumer complaints filed with the state's attorney general's office, the Court Appointed Receiver, the FTC, and the Better Business Bureau. The FTC submitted these complaints to the Court as Plaintiff's exhibits 48, 49, and 50.  As these complaints are hearsay, the Court denies Plaintiff's Motion.  However, contained within the exhibits are responses to the complaints by Defendants.  These will be considered as record evidence because they are party admissions. Fed. R. Evid. 801(d)(2).

[4]       Plaintiff filed a motion in limine (DE 93) requesting the Court to draw adverse inferences based on the individual Defendants' invocation of their *Fifth Amendment* privilege in

to the Defendants, for the purposes of this Summary Judgment Motion, are as follows.

### PARTIES

Plaintiff, the Federal Trade Commission, is an independent agency of the United States government created by statute. 15 U.S.C. §§ 41 *et seq*. The Commission is charged, *inter alia*, with enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce, as well as enforcement of the Franchise Rule, 16 C.F.R. § 436. The Commission is authorized to initiate federal district court proceedings, to enjoin violations of the FTC Act in order to secure such equitable relief as may be appropriate in each case, and to obtain consumer redress. 15 U.S.C. §§ 53(b) and 57(b).

Defendant Nationwide Cyber Systems, Inc., ("Nationwide") is a Florida corporation with its principal place of business located at 6030 Hollywood Boulevard, Suite 140, Hollywood, Florida 33024. Nationwide promoted and sold business ventures involving public access Internet kiosks. Nationwide transacted business in the Southern District of Florida. (Pl. Ex. 1, pp. 114, 118, 178.) Nationwide was incorporated in the state of Florida in January, 2001. (Pl. Ex. 9, pp. 31; Pl. Ex. 20, p. 16.)

Defendant Transnet Wireless Corporation, ("Transnet") is a Florida corporation with its

---

their answers and discovery responses, refusing to answer all substantive discovery questions. Courts have held that adverse inferences may be drawn in the civil context when Defendants invoke the privilege in refusing to testify in response to probative evidence offered against them. *Mitchell v. United States*, 526 U.S. 314, 328 (U.S. 1999). Courts may not draw adverse inferences, however, if it is the sole basis for Plaintiff's prima facie case, or will cause the "automatic entry of summary judgment." *United States v. Premises Located at Route 13*, 946 F. 2d 749, 756 (11th Cir. 1991) (citing *Pervis v. State Farm and Case. Co.*, 901 F.2d 944, 949 (11th Cir. 1990)). Here, in light of the myriad evidence presented by Plaintiff, the adverse inferences will not result in the automatic entry of summary judgment. Thus, Plaintiff's motion is granted; the Court will draw adverse inferences where it deems appropriate.

principal place of business located at 100 South Pine Island Road, Suite 200, Plantation, Florida 33324.  Transnet promoted and sold business ventures involving public access Internet kiosks or terminals and  transacted business in the Southern District of Florida.  (Pl. Ex. 1, pp. 85, 208.) Transnet was incorporated in the state of Florida in December 2002. (Pl. Ex. 1, p. 85.)

Defendant Paul Pemberton was an officer, director, manager, and/or an owner of both Nationwide and Transnet.  He formulated directed, controlled, or participated in the acts and practices of Nationwide and Transnet.  He transacted business in the Southern District of Florida. (Pl. Ex. 1, p. 120; Pl. Ex. 12, ¶ 3; Pl. Ex. 15, ¶ 4; Pl. Ex. 28, ¶ 3; Pl. Ex. 31, ¶ 4.)  Defendant Farris Pemberton was an officer, director, manager, and/or owner of corporate defendant Nationwide.  He formulated, directed, controlled, or participated in the acts and practices of Nationwide and transacted business in the Southern District of Florida.  (Pl. Ex. 1, pp. 113-120, Pl. Ex. 2, pp. 7, 12.)  Defendant Bradley Cartwright was an officer, director, manager, and/or owner of corporate defendant Transnet.  He formulated, directed, controlled, or participated in the acts and practices of Nationwide.  He transacted business in the Southern District of Florida. (Pl. Ex. 1, pp. 207-208, 221, 225, 293-300; Pl. Ex. 9, p. 32; Pl. Ex. 15, ¶ 23, p. 18; Pl. Ex. 16, pp. 6, 24.)

Relief Defendant Margaret Pemberton is an individual who received funds that can be traced to the corporate defendants' deceptive acts and practices.  She transacted business in the Southern District of Florida.  (Pl. Ex. 1, pp. 131-138, 147-156, 169-177; Pl. Ex. 36; Pl. Ex. 52.)

## BUSINESS ACTIVITIES

Since early 2001, Defendants have engaged in a course of conduct to advertise, market, promote, offer to sell, and sell to consumers business ventures involving public access Internet

kiosks, also known as kiosks or Internet terminals.  (Pl. Ex. 1-32.)  These free-standing Internet

kiosks house a computer hard-drive, monitor, wireless router, and vending slot.  (*Id.*)  The units

provide direct Internet access, for a fee, to numerous users from public locations, such as hotels,

airports, coffee houses, malls, hospitals, and bookstores.  (*Id.*)

Defendants promoted their business ventures to prospective purchasers through a variety

of media, including radio and television advertisements, an Internet web page, written marketing

materials, and telephonic and in-person sales pitches.  (*E.g.*, Pl. Ex. 1, pp. 220-247; Pl. Ex. 8, ¶ 1;

Pl. Ex. 9, ¶ 2; Pl. Ex. 13, ¶ 2; Pl. Ex. 31, ¶ 1.)  Through one or more of these means, Defendants

made various representations designed to lure prospective purchasers into buying a business

venture by misrepresenting (1) the amount of money the potential purchaser can reasonably

expect to earn with the business venture and (2) the availability and profitability of locations for

kiosks.  For example, a radio advertisement aired during programs, such as the Rush Limbaugh

program, stated:

> Would you like to own your own business and enjoy financial
> independence? . . . There is no technical knowledge required.  You
> get everything you need to own and operate your own business. . . .
> You simply receive a monthly check for all the wireless revenue
> generated at your location. . . . There is unlimited income potential.
> . . . Prime locations are available now.

(Pl. Ex. 1, p. 1; see also, Pl. Ex. 13, ¶¶ 2-3; Pl. Ex. 15, ¶ 1; Pl. Ex. 16, ¶ 2; Pl. Ex. 24, ¶ 2;

Pl. Ex. 29, ¶¶ 1-2; Pl. Ex. 31, ¶ 1.)

Defendants' television advertisements appeared on such channels as Fox News Network,

MSNBC, the Animal Planet, and ESPN.  (Pl. Ex. 6, 7, 15, 29; Pl. Ex. 40, p. 2.)  These television

advertisements, for example, represent to consumers that the business is a turnkey business, that

there is a potential to make significant sums of money, that prime locations are available, that a consumer will be running his/her own business, and that there will be a 100% return in the first year.  (Pl. Ex. 2, ¶ 2; Pl. Ex. 3, ¶ 2; Pl. Ex. 4, ¶ 2; Pl. Ex. 5, ¶ 2; Pl. Ex. 6, ¶ 2; Pl. Ex. 7, ¶ 2; Pl. Ex. 9, ¶ 2; Pl. Ex. 10, ¶ 2; Pl. Ex. 11, ¶ 2; Pl. Ex. 12, ¶ 1; Pl. Ex. 14, ¶ 2; Pl. Ex. 30, ¶ 2; Pl. Ex. 32, ¶ 2; Adv. Inf. 8, 42, 67, 129, 164.)  In their advertisements, Defendants made representations about the earnings potential of its business venture, and urged consumers to contact them through a toll-free number.  (*Id.*)  Prospective purchasers called and talked with one of the Defendants or the Defendants' salespeople.  (*E.g.*, Pl. Ex. 1, ¶ 7; Pl. Ex. 4, ¶ 2; Pl. Ex. 7, ¶ 2; Pl. Ex. 8, ¶ 1; Pl. Ex. 15, ¶ 2; Pl. Ex. 30, ¶ 4; Pl. Ex. 31, ¶ 2.)

During these sales calls, Defendants and their salespeople represented to prospective business venture purchasers that, in exchange for payment often ranging from $9,000 to $100,000, purchasers would receive public access Internet kiosk(s) and profitable locations, through which they were likely to derive substantial income.  (Pl. Ex. 5, ¶¶ 3-7; Pl. Ex. 6, ¶¶ 3-8; Pl. Ex. 8, ¶¶ 2-3; Pl. Ex. 10, ¶¶ 3-7; Pl. Ex. 13, ¶¶ 4-6; Pl. Ex. 14, ¶¶ 3-6; Pl. Ex. 15, ¶¶ 4-8; Pl. Ex. 16, ¶¶ 6-9; Pl. Ex. 26, ¶¶ 3-6; Pl. Ex. 29, ¶¶ 3-8; Pl. Ex. 30, ¶¶ 4-8; Pl. Ex. 31, ¶¶ 4-7; Pl. Ex. 39, pp. 5-7, 10-11, 14-20, 22-27.)  Generally, Defendants' salespeople told potential consumers that the average income generated from the business venture ranged from $1,000 to $2,000 per month per kiosk. (Pl. Ex. 2, ¶ 7; Pl. Ex. 3, ¶ 4; Pl. Ex. 4, ¶ 3; Pl. Ex. 5, ¶ 3; Pl. Ex. 6, ¶¶ 3-6; Pl. Ex. 7, ¶ 3; Pl. Ex. 8, ¶ 2; Pl. Ex. 10, ¶ 3; Pl. Ex. 12, ¶ 3; Pl. Ex. 13, ¶ 4; Pl. Ex. 14, ¶ 3; Pl. Ex. 15, ¶ 4; Pl. Ex. 16, ¶ 6; Pl. Ex. 17, ¶ 4; Pl. Ex. 18, ¶ 5; Pl. Ex., 19, ¶ 4; Pl. Ex. 20, ¶ 6; Pl. Ex. 21, ¶ 2; Pl. Ex. 22, ¶ 3; Pl. Ex. 23, ¶ 4; Pl. Ex. 24, ¶ 3; Pl. Ex. 25, ¶ 3; Pl. Ex. 29, ¶ 3; Pl. Ex. 31, ¶ 4; Pl. Ex. 32, ¶ 3; Pl. Ex. 39, pp. 19-21, 24-25, 35, 49-50.)

One scenario typically described by Defendants was that purchasers of just a 2-location plan, which consisted of 2 Internet kiosks and on-going support, for $17,990 to $25,000, would make over $20,000 per year. (*E.g.*, Pl. Ex. 2, ¶ 7; Pl. Ex. 5, ¶ 3; Pl. Ex. 6, ¶ 3; Pl. Ex. 8, ¶ 2; Pl. Ex. 10, ¶ 3; Pl. Ex. 13, ¶ 4; Pl. Ex. 26, ¶ 3.)  Additionally, Defendants would further entice consumers by stating that consumers could increase, and likely double, their income by selling advertisement space on the kiosk screen to businesses.  (Pl. Ex. 2, ¶ 9;  Pl. Ex. 5, ¶ 3; Pl. Ex. 10, ¶¶ 3-4; Pl. Ex. 12, ¶ 4; Pl. Ex. 14, ¶ 3; Pl. Ex. 17, ¶  4; Pl. Ex. 18, ¶  4; Pl. Ex. 20, ¶  7; Pl. Ex. 21, ¶  5; Pl. Ex. 22, ¶  7; Pl. Ex. 23, ¶  7; Pl. Ex. 24, ¶  4; Pl. Ex. 28, ¶  3; Pl. Ex. 29, ¶  4; Pl. Ex. 39, pp. 6, 15, 26-27, 31-32, 38, 45-46, 53, 59.)  Defendants also told consumers that they would recoup the cost of the terminal in one or two years. (Pl. Ex. 3, ¶ 4; Pl. Ex. 9, ¶ 3; Pl. Ex. 12, ¶ 3; Pl. Ex. 13, ¶ 5; Pl. Ex. 14, ¶ 3; Pl. Ex. 15, ¶ 4; Pl. Ex. 17, ¶ 4; Pl. Ex. 20, ¶ 6; Pl. Ex. 25, ¶  3; Pl. Ex. 26, ¶ 3; Pl. Ex. 27, ¶ 5; Pl. Ex. 28, ¶ 2; Pl. Ex. 31, ¶ 4; Pl. Ex. 37.)

As part of its sales pitch, Defendants represented in their promotional materials that they would assist consumers in finding the "very best locations available" in their area. (*E.g.*, Pl. Ex. 1, p. 2; Pl. Ex. 2, ¶ 5; Pl. Ex. 39, pp. 3, 16-17, 24, 33, 48.)  Defendants' sales representatives consistently told consumers that Defendants location is the key to the business and that Defendants' location department would find prime, high-traffic, and profitable locations in which to set up the Internet kiosk(s).  (Pl. Ex. 2, ¶ 10; Pl. Ex. 3, ¶ 4; Pl. Ex. 5, ¶ 5; Pl. Ex. 7, ¶ 2; Pl. Ex. 8, ¶ 2; Pl. Ex. 10, ¶¶ 2, 5; Pl. Ex. 12, ¶ 3; Pl. Ex. 14, ¶ 4; Pl. Ex. 15, ¶ 4; Pl. Ex. 16, ¶ 8; Pl. Ex. 17, ¶ 4; Pl. Ex. 21, ¶ 2; Pl. Ex. 23, ¶¶ 4, 7; Pl. Ex. 24, ¶ 7; Pl. Ex. 29, ¶ 3; Pl. Ex. 30, ¶ 5; Pl. Ex. 31, ¶ 5; Pl. Ex. 39, pp. 7, 16, 23-24, 32-33, 46-47, 53-54; *see also*, Pl. Ex 9, ¶ 4; Pl. Ex. 18, ¶ 5; Pl. Ex. 20, ¶ 8.)  Defendants assured customers that their location department would specifically

secure placement of the Internet kiosk(s) in locations such as hotels, hospitals, malls, airports, coffee shops, truck-stops, and marinas.  (Pl. Ex. 1, p. 15; Pl. Ex. 4,  ¶ 3; Pl. Ex. 5, ¶ 5; Pl. Ex. 6, ¶ 3; Pl. Ex. 10 ¶ 5; Pl. Ex. 11, ¶ 3; Pl. Ex. 12, ¶ 1; Pl. Ex. 16, ¶ 6; Pl. Ex. 17, ¶ 12, Pl. Ex. 21, ¶ 2; Pl. Ex. 22, ¶ 3; Pl. Ex. 25, ¶ 3; Pl. Ex. 26, ¶ 4; Pl. Ex. 27, ¶ 6; Pl. Ex. 30, ¶ 5; Pl. Ex. 39, pp. 7-8, 16, 23, 33, 47, 54.)  If the first location where the kiosk was placed was not successful, Defendants promised  that the company would re-locate the kiosk, generally telling consumers they would do so free of charge.  (Pl. Ex. 8, ¶ 2; Pl. Ex. 18, ¶ 3; Pl. Ex. 20, ¶ 6; Pl. Ex. 22, ¶ 5; Pl. Ex. 24, ¶ 7; Pl. Ex. 39, pp. 9, 17-18, 24, 33, 48, 54.)

Either before or after the initial sales pitch, Defendants sent a package of promotional materials to prospective purchasers.  (*E.g.*, Pl. Ex. 1, pp. 69-112; Pl. Ex. 12, pp. 8-9, 14-28; Pl. Ex. 15, pp. 11-34; Pl. Ex. 19, pp. 6-24; *see also*, Pl. Ex. 1, ¶¶ 8, 9; Pl. Ex. 17, ¶ 2, pp. 9-12; Pl. Ex. 20, pp. 9-31.)  This package typically included, among other things, a welcome letter from the president of the company, either Farris Pemberton at Nationwide or Bradley Cartwright at Transnet, promotional brochures and pamphlets, a video, and a disclosure document (the "basic disclosure document"). (*E.g.*, Pl. Ex. 1, pp. 69-112; Pl. Ex. 12, pp. 8-9, 14-28; Pl. Ex. 15, pp. 11-34; Pl. Ex. 32, pp. 8-27; Pl. Ex. 23, pp. 9-25.)  For example, the cover letter of the package of promotional materials for Nationwide stated, in part:

> If you're looking to start your own business and enjoy financial independence, then you have found a home with us.  Because of our future advertising goals, we are looking for only 100 Route Operators in your state.  We welcome you to join us while there is still availability. . . . When you follow our formula for success, a profitable business is just around the corner!

(Pl. Ex. 17, p. 9.)  Likewise, the cover letter of the package of promotional materials for Transnet

stated, in part:

> Transnet Wireless Corporation is offering you an opportunity to take advantage of the hottest and fastest growing sector in technology – Wireless Fidelity (Wi-Fi). . . . If you would like to own your own business and enjoy financial freedom, please take the time to review this package thoroughly. There is limited availability in each state. Your regional director will explain our program in detail and address any questions you may have.

(Pl. Ex. 1, p.73.) The Nationwide promotional brochure stated, in part:

> If you would like a MORE SECURE FUTURE, don't wait!
>
> Be your own boss. . . . Increase your monthly cash flow. Secure your future. . . . No technical knowledge required. . . . Light work.
>
> As with many businesses, location is all-important in providing high traffic. And with this product being so new, the best locations are still available. . . .
>
> Nationwide Cyber Systems, Inc. will assist you in obtaining the very best locations available in your area.
>
> Follow our formula for success, purchase and place the machines required, and then wait for the profits to roll in.
>
> Basically all you have to do is collect your money and keep your machines clean and running. About an hour a week per machine is generally all that's needed. . . .
>
> It's a perfect business opportunity for anyone wishing to supplement their income initially and to build a business that will generate a substantial income in the future; those looking for a career change; someone looking to establish their retirement; people planning for the future. It's perfect for retirees wishing to supplement fixed incomes.
>
> Maximum Profits. Your Nationwide Cyber Systems machines can generate income for years and years.
>
> A TURNKEY OPERATION
>
> VENDING + INTERNET = HUGE PROFITS

(Pl. Ex. 1, p. 105; Pl. Ex. 2, p. 8; Pl. Ex. 16, p. 17; Pl. Ex. 17, pp. 10-12; Pl. Ex. 19, p. 9; Pl. Ex.

20, pp. 10, 30; Pl. Ex. 24, p. 7; Pl. Ex. 32, p. 24.)  The Transnet promotional brochure stated, in

part:

> It's a perfect business opportunity for anyone wishing to
> supplement their income initially and to build a business that will
> generate a substantial income in the future; those looking for a
> career change; someone looking to establish their retirement;
> people planning for the future.  It's perfect for retirees wishing to
> supplement fixed incomes.
>
> Transnet offers a location assistance program that will assist you in
> securing the most profitable locations available in your area. . . .
>
> If you're not making money, we're not making money. . . .
>
> Keep in mind there are limited availability and the best locations
> won't last long!
>
> Your job is simply to remove the cash and wipe down machine on
> a periodic basis. . . .
>
> As a distributor, you will have a tremendous opportunity to earn
> substantial revenue from local advertising.  We provide a Local
> Advertising Guide as part of your welcome package. . . .
>
> Our creative services department offers custom products and
> services that will drive traffic to your machine and increase your
> revenue
>
> . . .whatever net profits your machines earn each year,  you can sell
> the business for three to four times that amount

(Pl. Ex. 1, pp. 105-111.)

Often, Defendants directed prospective purchasers to their website where charts depicted

the average amount of earnings consumers were projected to make.  The Defendants explained to

prospective purchasers that each kiosk made money based on the number of transactions conducted at the kiosk.  Then, Defendants and their salespeople told purchasers that the number of daily transactions on one kiosk typically ranged somewhere between 5 and 35 per day.  At this transaction rate, the chart illustrated the consumer making between $3,960 to $33,120 in net profits per kiosk per year.  (Pl. Ex. 1, ¶ 4(e); Pl. Ex. 2, ¶ 7; Pl. Ex. 6, ¶ 6; Pl. Ex. 9, ¶ 3; Pl. Ex. 9, p. 5; Pl. Ex. 10, ¶ 3; Pl. Ex. 13, ¶ 4; Pl. Ex. 14, ¶ 3; Pl. Ex. 16, ¶ 6; Pl. Ex. 19, ¶¶ 4-5; Pl. Ex. 20, ¶ 6; Pl. Ex. 22, ¶ 3; Pl. Ex. 24, ¶ 3; Pl. Ex. 26, ¶ 3; Pl. Ex. 27, ¶ 5; Pl. Ex. 29, ¶ 6; Pl. Ex. 31, ¶ 4.)

### *FRANCHISE RULE DISCLOSURES*

The basic disclosure document included in Defendants' promotional packet provided a few, but not all, of the disclosures required by the FTC's Franchise Rule, 16 C.F.R. Part 436. (Pl. Ex. 1, pp. 87-103; Pl. Ex. 15, pp. 13-28; Pl. Ex. 19, pp. 10-24; Pl. Ex. 34, pp. 4-14; Pl. Ex. 36, pp. 4-34.)  Specifically, the basic disclosure document for Nationwide failed to correctly identify all of the directors and executive officers of the corporate defendant, their business experience, and litigation history, as required by the Franchise Rule.  The Nationwide disclosure document sent to consumers contained no information regarding Paul Pemberton, even though he directed and controlled Nationwide's operations and signed bank records as vice-president of sales, as director of operations, and as regional director of Nationwide.  (Pl. Ex. 1, pp. 87-103, 113-120; Pl. Ex. 12, pp. 18-19; Pl. Ex. 19, pp. 14-15; Pl. Ex. 32, pp. 13-14; Pl. Ex. 34, p. 5; Pl. Ex. 43, pp. 6-8, 11, 12, 14.)

Likewise, the basic disclosure document for Transnet failed to correctly identify all of the directors and executive officers of the corporate defendant, their business experience for the past five years, and litigation history.  The disclosure document failed to identify Paul Pemberton

even though he was one of the individuals who directed and controlled the operations of Transnet as regional director and director of sales and marketing.  In addition, the Transnet disclosure document failed to disclose that Cartwright previously worked at and was Director of Operations at Nationwide.  *(E.g.*, Pl. Ex. 1, pp. 113-120; Pl. Ex. 6, ¶ 7; Pl. Ex. 12, ¶ 3; Pl. Ex. 19, pp. 14-15; Pl. Ex. 20, pp. 17-18; Pl. Ex. 23, pp. 15-16; Pl. Ex. 32, pp. 5, 13-14; Pl. Ex. 34; Pl. Ex. 1, pp. 87-103,  113-120; Pl. Ex. 12, pp. 18-19; Pl. Ex. 19, pp. 14-15; Pl. Ex. 32, pp. 13-14; Pl. Ex. 34, p. 5; Pl. Ex. 43, pp. 6-8, 11, 12, 14; Adv. Inf. 58.; Pl. Ex. 1, pp. 311, 383-84; Pl. Ex. 15, ¶ 4, pp. 18-19; Pl. Ex. 16, pp. 24-25; Pl. Ex. 24, pp. 17-18; Pl. Ex. 31, ¶ 4; Pl. Ex. 36, pp. 5, 19; Pl. Ex. 43, p. 2.)

In addition, Defendants' basic disclosure document failed to provide a statement disclosing the names, addresses and telephone numbers of any previous customers of either Nationwide or Transnet, as required by the Franchise Rule. (Pl. Ex. 15, pp. 13-28; Pl. Ex. 16, pp. 20-36; Pl. Ex. 19, pp. 10-24; Pl. Ex. 20, pp. 13-27; Pl. Ex. 23, pp. 11-25; Pl. Ex. 24, pp. 13-26; Pl. Ex. 32, pp. 9-23; Pl. Ex. 34, pp. 1-14; Pl. Ex. 36, pp. 1-34.)  Moreover, Defendants did not provide a reasonable basis for its earnings representations, failed to disclose additional information including the number and percentage of prior purchasers known by it to have achieved the same or better results, and failed to provide prospective business venture purchasers with an earnings claim document containing information substantiating its earnings representations (constituting a reasonable basis for those earnings claims).  (Pl. Ex. 15, pp. 13-28; Pl. Ex. 16, pp. 20-36; Pl. Ex. 19, pp. 10-24; Pl. Ex. 20, pp. 13-27; Pl. Ex. 23, pp. 11-25; Pl. Ex. 24, pp. 13-26; Pl. Ex. 32, pp. 9-23; Pl. Ex. 34, pp. 1-14; Pl. Ex. 36, pp. 1-34.)

For example, between early 2003 and early 2005, Defendants produced and distributed at

least four different disclosure statements for Nationwide and Transnet that failed to list the number or percentage of business opportunity ventures that attained the level of earnings Defendants claimed. (*E.g.*, Pl. Ex. 15, pp. 13-27; Pl. Ex. 19, pp. 10-24; Pl. Ex. 20, pp. 13-27; Pl. Ex. 23, pp. 11-25; Pl. Ex. 24, pp. 13-26; Pl. Ex. 32, pp. 9-23.)  In another example, between early 2003 and early 2005, Defendants produced and distributed at least four different disclosure statements for Nationwide and Transnet that failed to provide prospective purchasers with a reasonable basis for earnings claims at the time they were made or at the times required by the Franchise Rule. (Pl. Ex. 15, pp. 13-27; Pl. Ex. 19, pp. 10-24; Pl. Ex. 20, pp. 13-27; Pl. Ex. 23, pp. 11-25; Pl. Ex. 24, pp. 13-26; Pl. Ex. 32, pp. 9-23.)   Finally, Defendants failed to disclose the range of time that has elapsed between the signing of the franchise agreement and site selection. (Pl. Ex. 15, pp. 106-121; Pl. Ex. 34; Pl. Ex. 36.)

### *MISREPRESENTATIONS REGARDING INCOME*

In numerous instances, in the course of offering for sale and selling the Defendants' business venture, Defendants, directly or indirectly, represented, expressly or by implication, that consumers who purchased the Defendants' business opportunity were likely to earn substantial income.  Some of Defendants' claims were contained in its promotional pamphlet, as described above.  (*E.g.*, Pl. Ex. 1, ¶ 3; Pl. Ex. 2, ¶ 4-6; Pl. Ex. 6, ¶ 2; Pl. Ex. 30, ¶ 2; Pl. Ex. 31, ¶ 4; Pl. Ex. 39, pp. 6, 11, 20, 26, 50.)  For example, numerous scripts used by Defendants and their salespeople while selling the business opportunity to consumers made claims about income.  (Pl. Ex. 39, pp. 10-11, 19-20, 25-26, 31-32, 34-35, 42, 45-46, 49-50, 56-57, 79.)  The scripts state, among other things:

> So based on 2 hours of walk-up usage and only 7 wireless users per
> day, that's a 148 percent return on your investment in the first year.

Keep in mind that doesn't include *any* additional revenue generated from the machine. (Emphasis in original).

Leaving you with a net profit of $1,721 for the month.  Multiply that times 12 months and that's a total of $20,652 a year, net profit on each machine.

Today you may have 5 people a day logging on a day wireless, but a year from now that can easily be 20 people a day.  At an average of $6, that's over $43,000 a year, from wireless usage alone, in only one location!  That's the opportunity in this business!
There are two other ways that the machine will generate income for you.  First, e-commerce . . . You will receive a steady income stream that can cover your monthly expenses! . . . Get 25 advertisers at $500 that's 12,500 in advertising revenue.  The machine has the capacity for 245 advertisers, you're never going to get 245 but you wouldn't mind eventually having 45.

Get 10 or 20 of theses machines out there working for you, and you're talking about a substantial income requiring minimal time and effort on your part.

(*Id.*)  None of 31 consumers who provided declarations in this case achieved even close to the earnings promised by Defendants.  (*E.g.*, Pl. Ex. 2, ¶¶ 13-17, 21; Pl. Ex. 3, ¶ 18; Pl. Ex. 4, ¶¶ 12, 15; Pl. Ex. 5, ¶¶ 13, 16; Pl. Ex. 6, ¶¶ 12, 16; Pl. Ex. 7, ¶¶ 8, 11; Pl. Ex. 8, ¶¶ 7-8, 12; Pl. Ex. 9, ¶¶ 7-9, 12; Pl. Ex. 10, ¶¶ 11-14, 13;  Pl. Ex. 11, ¶¶ 8-12; Pl. Ex 12, ¶ 18; Pl. Ex. 13, ¶¶ 12; Pl. Ex. 14, ¶¶ 9-15, 18; Pl. Ex. 15, ¶¶ 15-17, 25; Pl. Ex. 26, ¶¶ 9, 15; Pl. Ex. 29, ¶ 14; Pl. Ex. 30, ¶¶ 13, 16; Pl. Ex. 31, ¶ 14; Pl. Ex. 33, ¶¶ 2(o), 3(g).)

With respect to kiosks, Defendants failed to locate the kiosks of many consumers.  (Pl. Ex. 3, ¶ 17; Pl. Ex. 5, ¶ 3; Pl. Ex. 7, ¶¶ 8-9; Pl. Ex. 12, ¶¶ 11-14; Pl. Ex. 13, ¶¶ 11-12; Pl. Ex. 16, ¶¶ 15-16; Pl. Ex. 20, ¶ 19; Pl. Ex. 23, ¶¶ 17-18; Pl. Ex. 24, ¶¶ 12-13; Pl. Ex. 25, ¶¶ 11-13; Pl. Ex. 29, ¶ 12; Pl. Ex. 32, ¶¶ 12-13.)  Many of the consumers whose kiosks were placed in locations received income of less than $50 per month per machine in gross revenue.  (*E.g.*, Pl. Ex. 2, ¶¶

13-16; Pl. Ex. 4, ¶ 12; Pl. Ex. 6, ¶ 12; Pl. Ex. 8, ¶¶ 7-8; Pl. Ex. 9, ¶¶ 7-9; Pl. Ex. 10, ¶¶ 10-13; Pl. Ex. 11, ¶¶ 8-9; Pl. Ex. 14, ¶¶ 8-14; Pl. Ex. 21, ¶ 23; Pl. Ex. 22, ¶¶ 17-18; Pl. Ex. 26, ¶¶ 9-11; Pl. Ex. 27, ¶ 11; Pl. Ex. 30, ¶¶ 9-13; Pl. Ex. 31, ¶ 11.)  For example, one consumer whose kiosk was located in a truck stop by Defendants made only $300 in total revenue in a 12-month period. Even when consumers became dissatisfied with the locations services of Defendants and found their own locations, of the type promoted by Defendants, consumers still failed to earn much money.  One consumer who placed his kiosks in high-traffic shopping malls made $50 in gross revenue per month over the six months that he kept them in their locations.  (Pl. Ex. 6, ¶¶ 11-12.) After his expenses, including lease and DSL line rental, this consumer lost money.  (*Id*.)  Most, if not all consumers, made no profit from Defendants' business venture.  (Pl. Ex. 2 - 32.)

None of the 31 consumers providing declarations to this Court recouped his/her investment within six months to one year or for a longer period of time. (*E.g.*, Pl. Ex. 2, ¶ 21; Pl. Ex. 3, ¶ 18; Pl. Ex. 4, ¶ 15; Pl. Ex. 5, ¶ 16; Pl. Ex. 6, ¶ 16; Pl. Ex. 7, ¶ 11; Pl. Ex. 8, ¶ 12; Pl. Ex. 9, ¶ 12; Pl. Ex. 10, ¶ 13;  Pl. Ex. 11, ¶¶ 8-12; Pl. Ex 12, ¶ 18; Pl. Ex. 13, ¶¶ 12; Pl. Ex. 14, ¶ 18; Pl. Ex. 15, ¶ 25; Pl. Ex. 23, ¶ 23; Pl. Ex. 24, ¶ 15;; Pl. Ex. 25, ¶ 18; Pl. Ex. 26, ¶ 15; Pl. Ex. 27, ¶ 14; Pl. Ex. 29, ¶ 14; Pl. Ex. 30, ¶¶ 13, 16; Pl. Ex. 31, ¶ 14.)  Defendants were aware that consumers were not earning substantial earnings from the Nationwide or Transnet business opportunity and achieving the projected sales levels; numerous consumers complained directly to Defendants that their locations were not generating the levels of income Defendants represented and Defendants then responded to the complaints.  (*E.g.*, Pl. Ex. 3, ¶¶ 14,15; Pl. Ex. 5, ¶ 10 ; Pl. Ex. 6, ¶ 13; Pl. Ex. 8, ¶¶ 8-9; Pl. Ex. 12, ¶ 13; Pl. Ex. 14, ¶ 15; Pl. Ex. 15, ¶¶ 17,18, 23; Pl. Ex. 26, ¶ 12; Pl. Ex. 48. Pl. Ex. 50.)

### *MISREPRESENTATIONS REGARDING LOCATIONS*

In numerous instances, in the course of offering for sale and selling the Nationwide and Transnet business ventures, Defendants, directly or indirectly, represented, expressly or by implication, that Nationwide or Transnet provided consumers with profitable locations in which to place their kiosks.  (Pl. Ex. 1, ¶ 4; *E.g.*, Pl. Ex. 1, p. 2; Pl. Ex. 2, ¶ 5; Pl. Ex. 39, pp. 3, 16-17, 24, 33, 48; Pl. Ex. 2, ¶ 10; Pl. Ex. 3, ¶ 4; Pl. Ex. 5, ¶ 5; Pl. Ex. 7, ¶ 2; Pl. Ex. 8, ¶ 2; Pl. Ex. 10, ¶¶ 2, 5; Pl. Ex. 12, ¶ 3; Pl. Ex. 14, ¶ 4; Pl. Ex. 15, ¶ 4; Pl. Ex. 16, ¶ 8; Pl. Ex. 17, ¶ 4; Pl. Ex. 21, ¶ 2; Pl. Ex. 23, ¶¶ 4, 7; Pl. Ex. 24, ¶ 7; Pl. Ex. 29, ¶ 3; Pl. Ex. 30, ¶ 5; Pl. Ex. 31, ¶ 5; Pl. Ex. 39, pp. 7, 16, 23-24, 32-33, 46-47, 53-54.)  Numerous scripts used by Defendants and their salespeople while selling the business opportunity to consumers made claims regarding locations.  (Pl. Ex. 39, pp. 7-8, 16-17, *see also*, pp. 23-24, 33-34, 46-48, 53-54.)  For example, the scripts stated:

> I'm sure you understand the key to *this* business is location and getting locations at this point is very easy because this is still an untapped market.  Prime locations are still available!  (Emphasis in original.)

> The types of locations we're looking for are high-traffic and high-volume locations like hotels, hospitals, malls, marinas, coffee shops, truck stops, and the list goes on.

> Transnet wireless has its own in-house locations department that will assist you in securing the most profitable locations available in your area.

> Our locators are trained sales professionals who research and qualify all potential locations to make sure they meet our criteria.

> [W]e get locations that have the demographics and traffic flow to generate a high-volume of sales.

> Oh, by the way we back each location up with a guarantee!  If you ever have a location that is not doing well, for whatever reason, we

16

will relocate that machine at absolutely no charge . . . .

(*Id.*)

During the sales call, Defendants told prospective purchasers that Defendants had their own in-house locations department that would assist the consumer in securing the most profitable locations available in the consumer's area and that the locators would research and qualify all the potential locations to make sure the locations meet consumers' criteria.  (Pl. Ex. 1, p. 15, ll. 18-24; Pl. Ex. 39, pp. 17, 47; Adv. Inf. 46.)  Defendants usually told consumers that a locator would contact them to arrange for the location of their kiosk(s).  (Pl. Ex. 2, ¶ 7; Pl. Ex. 10, ¶ 3; Pl. Ex. 23, ¶ 3; Pl. Ex. 39, pp. 17, 47.)   In addition, some consumers were told to send Defendants a "wish list" indicating where the consumer thought his/her kiosk(s) should be placed.  (Pl. Ex. 4, ¶ 5; Pl. Ex. 7, ¶ 5; Pl. Ex. 12, ¶ 6; Pl. Ex. 17, ¶¶ 6-7; Pl. Ex. 21, ¶ 4; Pl. Ex. 22, ¶ 10.)

Defendants told consumers that the in-house locator would set up appointments for two to three times the number of locations needed.  Then, the consumer would only have to look at the locations and select the location best suited for the consumer.  (Pl. Ex. 2, ¶ 10; Pl. Ex. 5, ¶ 5; Pl. Ex. 7, ¶ 3; Pl. Ex. 9, ¶ 4; Pl. Ex. 10, ¶ 5; Pl. Ex. 12, ¶ 6; Pl. Ex. 20, ¶ 8; Pl. Ex. 22, ¶ 3; Pl. Ex. 23, ¶ 7; Pl. Ex. 39, pp. 23-24.)   Defendants told consumers that they would back each location with a guarantee that if the consumer ever had a location that was not doing well, for any reason, Defendants would relocate the machine at no cost to the consumer.  (Pl. Ex. 8, ¶ 2; Pl. Ex. 18, ¶ 3; Pl. Ex. 20, ¶ 6; Pl. Ex. 22, ¶ 5; Pl. Ex. 24, ¶ 7; Pl. Ex. 39, pp. 9, 17-18, 24, 33, 48, 54; Pl. Ex. 41, pp. 1-15; Adv. Inf. 53.)

Consumers purchased the Nationwide and Transnet business opportunity based on Defendants' representations that their kiosks would be located in high-traffic, high volume

17

locations such as hotels, hospitals, malls, coffee shops, truck-stops, and marinas, including the guarantee of a free relocation of the kiosks if the consumer is dissatisfied with the level of sales. (Pl. Ex. 1, ¶ 4; Pl. Ex. 8, ¶ 2; Pl. Ex. 1, p. 15; Pl. Ex. 4, ¶ 3; Pl. Ex. 5, ¶ 5; Pl. Ex. 6, ¶ 3; Pl. Ex. 10 ¶ 5; Pl. Ex. 11, ¶ 3; Pl. Ex. 12, ¶ 1; Pl. Ex. 16, ¶ 6; Pl. Ex. 17, ¶ 12, Pl. Ex. 21, ¶ 2; Pl. Ex. 22, ¶ 3; Pl. Ex. 25, ¶ 3; Pl. Ex. 26, ¶ 4; Pl. Ex. 27, ¶ 6; Pl. Ex. 30, ¶ 5; Pl. Ex. 39, pp. 7-8, 16, 23, 33, 47, 54.)

   In actuality, none of the 31 consumer declarants consumers who filed consumers complaints against Defendants had their kiosks in high-traffic, high-volume, profitable locations. In fact, Defendants failed to locate at all the kiosks of many consumers.  Many others had their kiosks placed in low-traffic, low-end stores or similar undesirable locations.  Moreover, certain of the locations promised to consumers by Defendants were already under contract with other wireless providers or lacked the capability to connect to the internet without a significant monetary investment by the consumer.  (*E.g.*, Pl. Ex. 3, ¶ 17; Pl. Ex. 5, ¶ 3; Pl. Ex. 7, ¶¶ 8-9; Pl. Ex. 12, ¶¶ 11-14; Pl. Ex. 13, ¶¶ 11-12; Pl. Ex. 16, ¶¶ 15-16; Pl. Ex. 20, ¶ 19; Pl. Ex. 23, ¶¶ 17-18; Pl. Ex. 24, ¶¶ 12-13; Pl. Ex. 25, ¶¶ 11-13; Pl. Ex. 29, ¶ 12; Pl. Ex. 32, ¶¶ 12-13.); Pl. Ex. 4, ¶ 9; Pl. Ex. 5, ¶¶ 9-11; Pl. Ex. 10, ¶¶ 9-13; Pl. Ex. 12, ¶¶ 10-14; Pl. Ex. 14, ¶¶ 8-12; Pl. Ex. 16, ¶¶ 10-13; Pl. Ex. 17, ¶¶ 7-13; Pl. Ex. 18, ¶ 8; Pl. Ex. 19, ¶¶ 7–9; Pl. Ex. 20, ¶¶ 11-19; Pl. Ex. 25, ¶¶ 7-11; Pl. Ex. 27, ¶¶ 8-10; Pl. Ex. 32, ¶¶ 5-19.)  With some consumers, Defendants failed to place their kiosks – anywhere.  (Pl. Ex. 3, ¶ 17; Pl. Ex. 5, ¶ 3; Pl. Ex. 7, ¶¶ 8-9; Pl. Ex. 12, ¶¶ 11-14; Pl. Ex. 13, ¶¶ 11-12; Pl. Ex. 16, ¶¶ 15-16; Pl. Ex. 20, ¶ 19; Pl. Ex. 23, ¶¶ 17-18; Pl. Ex. 24, ¶¶ 12-13; Pl. Ex. 25, ¶¶ 11-13; Pl. Ex. 29, ¶ 12; Pl. Ex. 32, ¶¶ 12-13.)

### *INDIVIDUAL ACTIONS*

### Paul Pemberton

Defendant Paul Pemberton ran the day-to-day operations of the proposed Corporate Defendants.  He regularly held himself out as an officer or director of the companies.  For example, he told several Nationwide consumers that he was the president or the vice-president, and he told Transnet consumers that he was the regional director.  Many company documents listed Paul Pemberton as director of sales and marketing.  (*E.g.*,  Pl. Ex. 6, ¶ 7; Pl. Ex. 12, ¶ 3; Pl. Ex. 15, ¶ 4; Pl. Ex. 28, ¶ 3; Pl. Ex. 31, ¶ 4; Pl. Ex. 43, pp. 2, 6-8, 11-12, 14.)  In addition, Defendant Paul Pemberton signed corporate documents as vice-president of Nationwide.  (Pl. Ex. 1, pp. 115-116; Pl. Ex. 43, pp. 7, 11, 13.)  Paul Pemberton was also a signatory on the Nationwide bank accounts along with his brother, Farris Pemberton.  On those bank accounts, he was variously listed as vice-president of sales, regional director, and director of operations.  (Pl. Ex. 1, pp. 6, 113-120.)

Paul Pemberton made numerous sales pitches directly to consumers.  (Pl. Ex. 6, ¶ 7; Pl. Ex. 12, ¶ 3; Pl. Ex. 15, ¶ 4; Pl. Ex. 28, ¶ 3; Pl. Ex. 31, ¶¶ 4-5; Pl. Ex. 42.)  During his sales pitches, he made unsubstantiated earnings claims and claims about profitable locations. (Pl. Ex. 6, ¶ 7; Pl. Ex. 12, ¶ 3; Pl. Ex. 15, ¶ 4; Pl. Ex. 28, ¶ 3; Pl. Ex. 31, ¶¶ 4-5.)  He also received at least one consumer complaint.  (Pl. Ex. 3, ¶ 15.)  Additionally, Paul Pemberton hired and fired employees at Corporate Defendants.  (Adv. Inf. 32.)  He also monitored and often advised Nationwide's attorney on which course of action to pursue regarding legal action brought against Nationwide by consumers. (Pl. Ex. 44, pp. 3-4.)

**Farris Pemberton**

Defendant Farris Pemberton, along with his brother, Paul Pemberton, operated Nationwide.  Defendant Farris Pemberton held himself out as president of Nationwide and was listed in corporate documents as the president and CEO of Nationwide.  (Pl. Ex. 1, pp. 113-120; Pl. Ex. 2, p. 7; Pl. Ex. 9, p. 31; Pl. Ex. 11, p. 5; Pl. Ex. 12, p. 8; Pl. Ex. 17, p. 9; Pl. Ex. 19, p. 6; Pl. Ex. 28, ¶ 3; Pl. Ex. 34, p. 5; Pl. Ex. 45, pp. 6, 11, 13, 15, 17, 19, 21, 24, 28-29, 32.)  Among other documents, the FTC disclosure document stated that he was the president/director and sole executive officer of Nationwide. (Pl. Ex. 12, pp.18-19; Pl. Ex. 19, pp. 14-15; Pl. Ex. 23, pp. 15-16; Pl. Ex. 32, pp. 13-14.)

Along with his brother, Paul Pemberton, Farris Pemberton was a signatory on the Nationwide bank accounts.  (Pl. Ex. 1, pp. 113-120.)  Bank records list him as president, vice-president, treasurer, and secretary of Nationwide.  (Pl. Ex. 1, pp. 113-120.)  In addition, he is one of the signatories on Nationwide's office lease.  (Pl. Ex. 44, p. 17.)

Additionally, Farris Pemberton's signature block and/or signature are on the letters sent to consumers, thanking them for their inquiry and forwarding the package of promotional materials sent to consumers.  This letter makes representations of monetary success and profitability, including statements such as: "If you're looking to start your own business and enjoy financial independence, then you have found a home with us. . . . When you follow our formula for success, a profitable business is just around the corner!"  His signature is also on Nationwide's consumer purchase orders.  (Pl. Ex. 2, pp. 7, 12; Pl. Ex. 3, pp. 8-19; Pl. Ex. 6, p. 5; Pl. Ex. 9, p. 31; Pl. Ex. 11, pp. 5-6; Pl. Ex. 12, pp. 8, 11; Pl. Ex. 14, p. 8; Pl. Ex. 17, pp. 9,13; Pl. Ex. 18, p. 7; Pl. Ex. 19, pp. 6, 25; Pl. Ex. 20, pp. 9,17-18, 32; Pl. Ex. 22, p. 9; Pl. Ex. 23, p. 9, 26; Pl. Ex. 25,

20

p. 7; Pl. Ex. 27, p. 6; Pl. Ex. 30, pp. 6, 8-9; Pl. Ex. 32, pp. 8, 28, 30; Pl. Ex. 34, p. 5; *E.g.*, Pl. Ex. 2, p.7 ; Pl. Ex. 12, p. 8.; Pl. Ex. 17, p. 9; Pl. Ex. 19, p. 6; Pl. Ex. 20, p. 9.)

Farris Pemberton was introduced to at least two consumer declarants on site at Nationwide's offices.  He made claims to them, including earnings and locations claims to at least one of them.  (Pl. Ex. 25, ¶ 5; Pl. Ex. 26, ¶ 5.)  Farris Pemberton also received and responded to complaints made by consumers about deceptive practices of Nationwide, often denying refunds requested by the consumers.  (*E.g.*, Pl. Ex. 50, pp. 5-6, 9, 23, 23-29, 36-40, 50-51, 103, 106-107, 115-121; 152-155, 204-207, 247-248.)

### Bradley Cartwright

Defendant Bradley Cartwright, along with Defendant Paul Pemberton, operated and directed Transnet.  Defendant Cartwright is listed as the president of Transnet on the Florida Business Opportunity Act filing application and as the president and sole shareholder of Transnet on the FTC Franchise Rule disclosure document, on the City of Plantation, Florida, business license application form, and on Transnet's website.  (Pl. Ex. 1, p. 91, 207-208, 221, 225, 293-300; Pl. Ex. 15, p. 18.)  He was also a signatory on the Transnet bank accounts where he was listed as the president of Transnet.  (Pl. Ex. 1, pp. 121-126.)

Defendant Cartwright's signature is on letters sent to consumers, thanking them for their inquiry and forwarding the package of promotional materials sent to consumers.  The letter makes representations of success and financial freedom, including: "This is your opportunity to get in on the ground level of this exciting new technology.  If you would like to own your own business and enjoy financial freedom, please take the time to review this package thoroughly. There is limited availability in each state."  These letters are signed by Defendant Cartwright as

president of Transnet.  (*E.g.*, Pl. Ex. 15, p. 11; Pl. Ex. 16, p. 6; Pl. Ex. 24, p. 6.)

In addition, Defendant Cartwright spoke directly to consumers concerning their

complaints about Transnet.  For example, Cartwright told one consumer that Transnet does not

give refunds and he would "See you in court, buddy."  Likewise, Cartwright handled customer

service complaints, often denying refunds to disgruntled consumers.  (Pl. Ex. 15, ¶ 23; Pl. Ex. 48,

pp. 1, 21, 26-27.)  Bank records indicate that Cartwright signed checks drawn on Transnet's bank

account and received significant sums of money from Transnet.  (Pl. Ex. 1, pp. 121-168, 207-

211.)

Defendant Cartwright also worked at Nationwide for a period of time and earned for a

portion of that time (February to April 2004) at least $25,500 in salary and commissions.  (Pl. Ex.

1, pp. 178-84.)  A Nationwide document that listed information about its corporate executives

indicated that Cartwright had been the Director of Operations for Nationwide. (Pl. Ex. 9, pp. 31-

32.)   As such, Defendant Bradley Cartwright directed, controlled and participated in the

operations of Nationwide and Transnet and had knowledge of the deceptive acts and practices.

(Pl. Statement of Facts, ¶ 81.)

### Margaret Pemberton

Relief Defendant Margaret Pemberton possessed money from Nationwide and Transnet to

which she had no legitimate claim.  She received a substantial amount of money from the

Defendants, which were derived from the deceptive practices of Defendants. (Pl. Ex. 1, pp. 131-

138, 147-156; Pl. Ex. 38, pp. 1-18; Pl. Ex. 57; Pl. Ex. 58.)  A partial set of bank records shows

that she obtained at least $1.3 million directly from Nationwide and Transnet.  The bank records

also show that she was paid at least an additional $300,000 from the account of Cartwright

Consulting, which was the account through which Transnet paid Bradley Cartwright.  (Pl. Ex. 62.)

Bank records show that she was regularly given large sums of money on a monthly basis from Corporate Defendants, often in greater amounts than that being paid to her husband, Paul Pemberton, and to Bradley Cartwright.  (Pl. Ex. 1, pp. 127-168.)  A sample of Transnet's bank records indicate that Relief Defendant Margaret Pemberton received $10,532 from Transnet in October 2004 and $27,430 from Transnet in April 2005.  Checks show, for example, that for the month of April 2005, Bradley Cartwright was paid $15,214. (Pl. Ex. 1, pp. 135-138, 147, 149, 151, 153, 157-166.)  In addition, a sample of documents for a three-month period in 2002 show that Relief Defendant Margaret Pemberton received over $20,000 from Nationwide.  (Pl. Ex. 38, pp. 1-2, 5-8, 11-16.)

Nothing on the record indicates that Margaret Pemberton provided any services to Corporate Defendants.  Moreover, certain monthly payments of amounts greater than Paul Pemberton and Bradley Cartwright  indicate that she had no legitimate claim to sums paid to her by the Corporate Defendants or by Defendant Bradley Cartwright (through Cartwright Consulting).  (Pl. Ex. 1, pp. 135-138, 147, 149, 151, 153, 157-166; Pl. Ex. 38, pp. 1-2, 5-8, 11-16.)

### MATERIALITY AND RELIANCE

The consumers relied upon the earnings claims made by Defendants when deciding whether to purchase the public access Internet kiosk business opportunity from Defendants.  (*E.g.*, Pl. Ex. 4, ¶ 5; Pl. Ex. 5, ¶ 7; Pl. Ex. 6, ¶ 8; Pl. Ex. 15, ¶ 8;   Pl. Ex. 16, ¶ 8; Pl. Ex. 20, ¶ 10; Pl. Ex. 24, ¶ 8; Pl. Ex. 27, ¶ 7; Pl. Ex. 31, ¶ 7.)  The level of earnings claimed by

Defendants was material to the consumers when deciding whether to purchase the public Internet access kiosk business opportunity from Defendants. (*E.g.*, Pl. Ex. 2, ¶ 18; Pl. Ex. 4, ¶ 13; Pl. Ex. 5, ¶ 14;  Pl. Ex. 6, ¶ 15;  Pl. Ex. 11, ¶ 10; Pl. Ex. 15, ¶ 24; Pl. Ex. 16, ¶ 17; Pl. Ex. 20, ¶ 20; Pl. Ex. 27, ¶ 12; Pl. Ex. 31, ¶ 13.)

The consumers relied upon the Defendants' claims that the Defendants would actively provide location assistance, which would result in revenues to consumers ranging from  $1,000 to $2,000 per machine per month, working part-time. (*E.g.*, Pl. Ex. 2, ¶¶ 10, 12; Pl. Ex. 4, ¶¶ 3, 15; Pl. Ex. 5, ¶¶ 3, 7; Pl. Ex. 8, ¶¶ 2-3; Pl. Ex. 12, ¶¶ 3, 9; Pl. Ex. 15, ¶¶ 4, 8; Pl. Ex. 20, ¶ 10; Pl. Ex. 27, ¶ 7.)  Defendants' claim to provide location assistance was material to consumers when deciding whether to purchase the public access Internet kiosk business opportunity from Defendants. (*E.g.*, Pl. Ex. 2, ¶ 19; Pl. Ex. 4, ¶ 14; Pl. Ex. 5, ¶ 15; Pl. Ex. 8, ¶ 11; Pl. Ex. 15, ¶ 24; Pl. Ex. 20, ¶ 21; Pl. Ex. 27, ¶ 13.)

The record evidence establishes that Consumers would not have purchased the public access Internet Kiosk business opportunity from Defendants had they been aware that the typical consumer did not achieve the level of earnings which were represented in the sales pitch. (*E.g.*, Pl. Ex. 2, ¶ 18; Pl. Ex. 4, ¶ 13; Pl. Ex. 5, ¶ 14; Pl. Ex. 6, ¶ 15; Pl. Ex. 8, ¶ 10; Pl. Ex. 15, ¶ 24;  Pl. Ex. 17, ¶ 18; Pl. Ex. 27, ¶ 12;  Pl. Ex. 31, ¶ 13.)  Nor would Consumers have purchased the public access Internet kiosk business opportunity from Defendants had they been aware that the Defendants would not find them locations which generated the levels of income expressly and impliedly represented in the advertisements and in the telephone sales pitch. (*E.g.*, Pl. Ex. 2, ¶ 19; Pl. Ex. 4, ¶ 14; Pl. Ex. 5, ¶ 15; Pl. Ex. 8, ¶ 11; Pl. Ex. 15, ¶ 24; Pl. Ex. 20, ¶ 21; Pl. Ex. 27, ¶ 13; Pl. Ex. 31, ¶ 13.)

_____*CONSUMER INJURY*

Consumers spent at least $9,000 for each kiosk that they purchased.  (*E.g.*, Pl. Ex. 16, ¶¶ 8-9.)  Frequently, the consumers purchased a business opportunity consisting of two kiosks for over $20,000.  A number of consumers purchased a business opportunity consisting of five kiosks for $40,000 or more. (*E.g.*, Pl. Ex. 2, ¶ 12;  Pl. Ex. 5, ¶ 7; Pl. Ex. 6, ¶ 8; Pl. Ex. 8, ¶ 3; Pl. Ex. 9, ¶ 5; Pl. Ex. 10, ¶ 7; Pl. Ex. 13, ¶ 6; Pl. Ex. 14, ¶¶ 6, 7; Pl. Ex. 18, ¶ 8;  Pl. Ex. 19, ¶ 6; Pl. Ex. 26, ¶ 6; Pl. Ex. 31, ¶ 7.)  None of 31 consumers who provided declarations filed with this Court achieved anything more than nominal amounts of income, and, in many cases, no or almost no income.  (Pl. Ex. 4, ¶ 9; Pl. Ex. 5, ¶¶ 9-11; Pl. Ex. 10, ¶¶ 9-13; Pl. Ex. 12, ¶¶ 10-14; Pl. Ex. 14, ¶¶ 8-12; Pl. Ex. 16, ¶¶ 10-13; Pl. Ex. 17, ¶¶ 7-13; Pl. Ex. 18, ¶ 8; Pl. Ex. 19, ¶¶ 7–9; Pl. Ex. 20, ¶¶ 11-19; Pl. Ex. 25, ¶¶ 7-11; Pl. Ex. 27, ¶¶ 8-10; Pl. Ex. 32, ¶¶ 5-19; Pl. Ex. 3, ¶ 17; Pl. Ex. 5, ¶ 3; Pl. Ex. 7, ¶¶ 8-9; Pl. Ex. 12, ¶¶ 11-14; Pl. Ex. 13, ¶¶ 11-12; Pl. Ex. 16, ¶¶ 15-16; Pl. Ex. 20, ¶ 19; Pl. Ex. 23, ¶¶ 17-18; Pl. Ex. 24, ¶¶ 12-13; Pl. Ex. 25, ¶¶ 11-13; Pl. Ex. 29, ¶ 12; Pl. Ex. 32, ¶¶ 12-13.)

In selling the public access Internet business venture, Transnet's Profit and Loss spreadsheet for the period of January 1, 1999 through October 20, 2005, indicates that Transnet received $17,447,409.00 in sales.  Plaintiff asserts that all of these proceeds were received from consumers who purchased Defendants' internet kiosk business opportunity venture and Defendants have not refuted this amount.  According to the same Profit and Loss Spreadsheet, Transnet refunded $238,396.17.  Thus, after refunds, Transnet grossed $17,209,012.83  (Pl. Ex. 51.)  As the Defendants have not provided any evidence to dispute the amount of sales recorded on Transnet's own profit and loss spreadsheet, the Court accepts this figure as the total amount

consumers paid out to Transnet.

In selling the public access Internet business venture, Defendants' bank statements indicate that Nationwide deposited approximately $31 million.[5]  (Pl. Ex. 1, pp. 248-293.) Assuming the refunds for Nationwide were double the amount of refunds for Transnet, (based on Nationwide's nearly doubling the amount of Transnet's sales) Nationwide grossed, after refunds, approximately $30,908,752.66.[6]

## II.      Legal Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323(1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the

---

[5]        This number is based on the amount of deposits Nationwide made in its Wachovia bank account.  Based on Defendant's failure to dispute this amount, the Court accepts it as the amount Nationwide earned from customers. .

[6]        The Court accepts the FTC's formula for assuming Nationwide's refunds were $476,793.94 as Plaintiff's estimation benefits Defendants absent any asserted amount of refunds by Defendants.

absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  *Id.* at 325.

After the movant has met its burden under Rule 56©, the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  According to the plain language of  Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  *Anderson*, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted."  *Anderson*, 477 U.S. 242, 249-50.

If the non-moving party fails to submit the necessary sworn affidavits or the concise statement of material fact , the Court may accept all material facts set forth in the Motion as true in accordance with Local Rule 7.5.D.

27

### III.    Discussion

### A.    *Violations Section 5 of the FTC Act*

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting

commerce."  15 U.S.C. § 45(a).  To establish that an act or practice is deceptive under Section 5

of the FTC Act, the FTC must establish that (1) there was a representation; (2) the representation

was likely to mislead consumers acting reasonably under the circumstances, and (3) the

representation was material.  *FTC v. Tashman*, 318 F. 3d 1273, 1277 (11th Cir. 2003) (citing

*FTC v. Atlantex Assocs.*, 1987-2 Trade Cas. (CCH) ¶ 67,778 at 59,252 (S.D. Fla. 1987), *aff'd*,

872 F. 2d 966 (11th Cir. 1987));  *FTC v. Peoples Credit First, LLC*, 2005 U.S. Dist. LEXIS

38545, 19-20 (M.D. Fla. 2005); *FTC v. Jordan Ashley, Inc.*, 1994-1 Trade Cas.  (CCH) ¶ 70, 570

at 72,096 (S.D. Fla. 1994) (citing  *FTC v. Amy Travel Serv. Inc.*, 875 F. 2d 564 (7th Cir.), *cert.*

*denied,* 493 U.S. 954 (1989)).

A representation is material if it is of a kind usually relied upon by a reasonably prudent

person.   *FTC v. Jordan Ashley, Inc.*, 1994-1 Trade Cas.  (CCH) ¶ 70, 570 at 72,096 (S.D. Fla.

1994) (citing *FTC v. Amy Travel Serv. Inc.*, 875 F. 2d 564 (7th Cir.), *cert. denied*, 493 U.S. 954

(1989)).  The Commission, however, need not present proof of subjective reliance by each

victim:

> In an FTC Act Section 13(b) enforcement action in which the
> government seeks restitution to compensate thousands of
> individuals victims of unlawful practices, in contrast to a private
> action for fraud, such representative proof of injury suffered is
> sufficient to justify the requested relief . . . . Requiring proof of
> subjective reliance by each individual consumer would thwart
> effective prosecution of large consumer redress actions and
> frustrate the statutory goals of the section.

*FTC v. U.S. Oil & Gas Corp.*, 1987 U.S. Dist. LEXIS 16137 at *68 (S.D. Fla. July 10, 1987).  "A presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product."  *FTC v. Figgie Int'l, Inc.*, 994 F. 2d 595, 605 (9th Cir. 1993), *cert. denied*, 510 U.S. 1110 (1994)  Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material.  *Thompson Medical Co.*, 104 F.T.C. 648, 816 (1984), *aff'd*, 791 F. 2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987); *Jordan Ashley*, 1994-1 Trade Cas. at 72,096.

Here, the undisputed evidence establishes that Defendants made material representations, express or implied, that were likely to mislead reasonably prudent consumers.  Defendants violated Section 5 of the FTC Act by making two material  misrepresentations: (1)the potential earnings a consumer was likely to achieve by purchasing Defendants' internet kiosks and (2) claims about the availability and procurement of profitable locations for consumers' public access Internet kiosks.

### i. Misrepresentations Regarding Income

As discussed in detail above in the Background Section, Defendants misrepresented the earnings potential of business opportunities offered through Nationwide and Transnet. Defendants solicited prospective consumers through the internet and advertisements on the radio and television.  These advertisements enticed consumers by promising a return of their initial investment within the first year of operation.  After responding to the advertisements by calling the toll-free number, consumers were connected to a Nationwide or Transnet salesperson.  Once on the line, the salespeople reiterated the representations made in the advertisements, laying out

the seemingly low-risk/high-reward opportunities.

The material representations made by salespersons were clear: in exchange for a payment of $9,000 to $100,000 (depending on the number of kiosks purchased), consumers would receive internet kiosks that would each generate, at the very minimum, income from $1,000 to $2,000 per month. For example, if the consumer purchased two Internet kiosks for $17,990 to $30,000, they could expect to make more than $20,000 per year. The scripts used by the salespersons confirm this.

Defendants then sent consumers a 'welcome' packet of information that included the welcome letter from the president, brochures, and the Franchise Disclosure statement. The various claims in the brochures, cited to above, would lead a reasonably prudent consumer to conclude that a substantial income would be generated by the business opportunity. To bolster these claims, Defendants directed purchasers to their website where charts detailed the *average* amount of earnings consumers were projected to make. These numbers depicted in the chart coincided with what the salespersons had promised on the phone. In short, the typical number of daily transactions on one kiosk ranged from 5 to 35 per day. Based on these projections, consumers could expect to make between $3,960 to $33,120 in net profits *per* kiosk *per* year. Additionally, Defendants told consumers that their income could be doubled by selling advertising on the screen.

In actuality, none of the 31 consumers who provided declarations in this case achieved even close to the earnings promised by Defendants. There is no evidence on the record of anyone who recouped even their initial investment, within the first year promised, or at all. Rather, most consumers received less than $50 per month in gross revenue. In fact, most, if not all consumers,

did not make *any* profit. Most consumers could not even cover their cost of their wireless internet.

When fairly and reasonably viewed as a whole, the Court concludes that this barrage of misrepresentations, promising substantial income and backed up by ostensibly concrete numbers, were material and likely to mislead consumers acting reasonably under the circumstances. Not only were they likely to mislead reasonably prudent consumers, but they did, resulting in over $47 million in sales.

### ii. Misrepresentations Regarding Location Assistance

The Defendants misrepresentations about securing profitable locations for the placement of the internet kiosks were equally material and violative of Section 5 of the Franchise Act. After emphasizing the importance of securing prime locations, Defendants then promised to find and secure profitable locations for prospective consumers' kiosks. These representations were made in print, over the phone, and over the internet. Consumers were told that Defendants had an in-house location department that would not only research to find the best and most convenient locations to suit each individual consumer, but would then also secure that location. Consumer participation was essentially reduced to choosing the best location presented by Defendants. To assuage any fears of a bad placement, Defendants promised to relocate the kiosks free of charge.

In actuality, none of the 31 consumer declarants had their kiosks placed in a profitable location. None of the locations secured by Defendants were in high-volume sites. When consumers requested a change of location, often nothing happened. For some consumers, Defendants found no locations at all. None of the locations generated a profit as promised. What little assistance was provided fell far short of what was promised.

When fairly and reasonably viewed as a whole, the misrepresentations regarding the procurement of the kiosks were undisputably material misrepresentations that were likely to mislead, and in fact did mislead, consumers acting reasonably under the circumstances. These promises were unequivocal, consistent, and backed up by guarantees. All the evidence in the record indicates that reasonably prudent consumers would rely on these misrepresentations.

**B. *The Franchise Rule***

The Franchise Rule or Business Opportunity Rule, set out in 16 C.F.R. § 436.1 and titled Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" requires the franchisor to provide prospective franchisees or purchasers with a complete and accurate basic disclosure document containing twenty categories of information, including identity and experience information about the directors and executive officers of the franchisor as well as the identity of previous franchisees. 16 C.F.R. §§ 436.1(a)(2) and (a)(16). The franchisor must also disclose the names addresses, and telephone numbers of the ten franchisees nearest the prospective purchaser, or all franchisees in the state where the prospective purchaser is locating the business, or all of the franchisees. 16 C.F.R. § 436.1 (a)(16). The Franchise Rule also requires that the Franchise Disclosure Document disclose the range of time that has elapsed between the signing of the franchise agreement and site selection. 16 C.F.R. § 436.1(a)(17)

The Franchise Rule additionally requires: (1) that the franchisor have a reasonable basis for any oral, written, or visual earnings or profit representation ("earnings claim") it makes to a prospective franchisee; (2) that the franchisor provide to prospective franchisees an earnings claim document containing information substantiating any earnings claims it makes; and (3) that

the franchisor, in immediate conjunction with any generally disseminated earnings claim,

disclose additional information including the number and percentage of prior purchasers known

by the franchisor to have achieved the same or better results.  16 C.F.R. §§ 436.1(b), (c), and (e).

A violation of the franchise rule constitutes a violation of 15 U.S.C. § 45(a). Section

57a(a)(1)(B) of Title Fifteen provides the FTC with authority to promulgate rules which define

with specificity acts or practices which are unfair or deceptive within the meaning of section

45(a).  The franchise rule represents an exercise by the FTC of that authority.  Section §57a(d)(3)

of Title Fifteen states that a violation of a rule promulgated pursuant to section 57a(a)(1)(B), like

the franchise rule, constitutes a violation of the prohibition against deceptive and unfair trade

practices in section 45(a).  *FTC v. Jordan Ashley, Inc*., 1994-1Trade Cas. (CCH) ¶ 70,570 at

72,096, n.3.

Business ventures sold by Defendants are franchises as defined in Sections

436.2(a)(1)(ii), (a)(2), and (a)(5) of the Franchise Rule, 16 C.F.R. § 436.2(a)(1)(ii), (a)(2), and

(a)(5).[7]  (Pl. Ex. 15, pp. 13-27; Pl. Ex. 19, pp. 10-24.)  Defendants provided some  prospective

customers with a Franchise Disclosure Document, the document itself acknowledging

Transnet/Nationwide was a business opportunity venture and therefore subject to 16 C.F.R.

§  436.1: "TRANSNET may be considered a *business opportunity venture* under Title 16, Code

of Federal Regulations, Section 436.1 to 436.2, a Trade Regulation of the Federal Trade

Commission regarding Disclosure Requirements and Prohibitions Concerning Franchising and

Business Opportunity Ventures (the FTC Franchise Rule)."  (Pl. Ex. 15, pp. 13-27; Pl. Ex. 19,

---

[7]      As defined in 16 C.F.R. § 436.2(a) and (c), "franchise" includes "business
opportunity ventures" as defined in Sections 436.2(1)(ii) and (2), discussed in the FTC's Final
Interpretive Guide for the Franchise Rule, 44 Fed. Reg. 49966-68 (August 24, 1979).

pp. 10-24.)  In these Disclosures, Defendants made earnings claims within the meaning of the
Rule  Sections  436.1(b), (c), and (e).  The Franchise Disclosure Documents provided by
Defendants were deficient in several ways, thereby violating the Franchise Rule or Business
Opportunity Rule.

First, Defendants did not disclose the names and business experiences of current directors
and officers for the previous five years.  For example, Paul Pemberton was not identified on the
Disclosure Documents for either Nationwide or Transnet despite the overwhelming record
evidence that he directed and controlled both companies.  On the Transnet Disclosure Document,
Defendant Cartwright is listed as the President of Transnet and details his prior work experience.
Absent for his prior work experience is his tenure as the Director of Operations at Nationwide.

Second, the Franchise Disclosure Documents did not disclose any names, addresses, and
telephone numbers of other business ventures as required by the Rule.   The consumers were
never provided with a list of purchasers by either company.  This violates C.F.R. §  436.1 (a)(16).
Third, the Disclosure Document did not disclose the range of time that had elapsed between the
signing of the franchise agreement and site selection.  This violates 16 C.F.R. § 436.1(a)(17).

Fourth, the record evidence demonstrates that Defendants did not include or provide a
"reasonable basis" for their earnings claims made to prospective purchasers during the oral sales
presentations, in the written solicitations, or through the required disclosures in the Franchise
Disclosure Document.  Defendants also did not disclose the number of prior purchasers known to
have achieved the same or better results.  These failures constitute further violations of the
Franchise Rule.  16 C.F.R. §§ 436.1(b), (c), and (e).

34

*C.  Liability of Individual Defendants*

Once corporate liability has been established for violations of the FTC Act, two elements must be fulfilled for the FTC to establish individual liability: "the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them . . . the FTC must then demonstrate that the individual had some knowledge of the practices." *FTC v. Gem Merchandising Corp.*, 87 F. 3d 466, 470 (11th Cir. 1996)(quoting *Amy Travel*, 875 F. 2d at 573.)  The FTC may establish the knowledge requirement by showing that individual had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth."  *Amy Travel*, 875 F. 2d at 574, (quoting *Kitco*, 612 F. Supp. 1282, 1292 (D. Minn. 1985)).

"An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation.  'A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception.' " *FTC v. Windward Mktg.*, 1997 WL 33642380, 25 (N.D. Ga. Sept. 30, 1997) (quoting *Standard Educators, Inc. v. FTC*, 475 F.2d  401, 403 (D.C. Cir. 1973)).  "The degree of participation in business is probative of knowledge."  *Amy Travel*, 874 F.2d at 574 (citing *FTC v. International Diamond Corp.*, 1983-2 Trade Cas. (CCH) 65,725  at 69,707-8.  The FTC does not need to demonstrate, however, that the individual defendant had the intent to defraud.  *Jordan Ashley*, 1994-1 Trade Cas (CCH) at 72,096 (citing *Amy Travel*, 875 F.2d at 573-4).

In crafting a remedy, the Court has the authority to exercise its full equitable powers

35

under Section 13(b) of the FTC Act to remedy violations of Section 5 of the Act.  *Gem Merchandising*, 87 F. 3d at 469-70.  Included in the panoply of remedies are monetary remedies, including disgorgement and restitution.  *Gem Merchandising*, 87 F. 3d at 469; *U.S. Oil & Gas*, 748 F. 2d at 1432, 1434; *FTC v. Silueta Distrib. Inc*., 1995-1 Trade Cas. (CCH) ¶ 70,918 at 74,100 (N.D. Cal. 1995); *FTC v. Pantron I Corp*., 33 F. 3d 1088, 1103 & n.34 (9th Cir. 1994), *cert denied*, 514 U.S. 1083 (1995); *Figgie Int'l*, 994 F. 2d at 606-8.  In a deceptive sales scheme, restitution may be measured by the amount of loss suffered by the victim and the return to status quo.  *Figgie Int'l*, 994 F. 2d at 606-8; *Atlantex*, 1987-2 Trade Cas. at 59,256.  Defendants who have violated Section 5 of the FTC act can be held jointly and severally liable for the total amount of consumer injury. *Atlantex Assocs.*, 1987-2 Trade Cas. at 59,256; *FTC v. Sharp*, 782 F. Supp. 1445, 1452-54 (D.Nev. 1991).

Here it is clear that all three individuals exercised control over the corporations and had some knowledge of the deceptive practices, as the knowledge element is defined.  The record evidence establishes that Paul Pemberton directed and controlled Transnet and Nationwide from behind the scenes.  Although he attempted to conceal his true involvement by surreptitiously keeping his name off the Florida Corporate Registration and the Franchise Disclosure Documents, the record evidence, including Paul Pemberton's blanket use of the Fifth Amendment, leads this Court to conclude the absence of his name on these documents was merely a ploy to avoid liability.  Paul Pemberton was a signatory on the Nationwide bank accounts, where he signed as vice president of sales, regional director, and director of operations.  He also had the power to hire and fire employees.  When Paul Pemberton talked to purchasers, he held himself out as president or vice president of Nationwide and regional director of Transnet.

36

Not only did he assume executive titles, but he directly participated in the companies' deceptive practices. He pitched customers of both companies, promising unsubstantiated high profits and the securement of profitable locations. This personal participation underscores knowledge. This knowledge requirement is further proved by Paul Pemberton's and the company's receipt of consumer complaints and the companies' subsequent responses to those complaints, denying most refunds and frequently telling consumers that it was company policy not to give refunds. Based on the record evidence, Paul Pemberton is personally liable for the deceptive acts of Nationwide and Transnet.

Farris Pemberton is also personally liable for the deceptive corporate acts of Nationwide. Farris Pemberton controlled and directed Nationwide and oversaw its deceptive practices. Farris Pemberton was the president and CEO of Nationwide, as stated on Florida Secretary of State's records. Bank records list him as president, vice president, treasurer, and secretary of Nationwide and he was a signatory on Nationwide's bank accounts. He is also listed as president of Nationwide on the applications for the Better Business Bureau of Southeast Florida and the Greater Hollywood, Florida, Chamber of Commerce membership applications. His authority to control the corporation and his participation is unquestionable.

In the initial package of promotional materials, consumers received a letter, thanking them for the inquiry and making some of the initial representations and about profitability and location. Farris Pemberton's signed these letters as president of Nationwide. Farris Pemberton also responded to consumer complaints, refusing to refund the kiosks. At least two consumer declarants were introduced to Farris Pemberton - he made earnings claims to both of them and locations claims to one of them. Based on the record evidence and the adverse inferences, the

37

Court concludes Farris Pemberton is personally liable for the deceptive acts and practices of Nationwide.

The Court also finds Brad Cartwright personally liable for the deceptive acts and practices of Transnet.  Defendant Cartwright, along with Paul Pemberton, operated Transnet, both participating in its deceptive acts and practices and having knowledge thereof.  He was also actively involved in the operations of Nationwide.  This is conclusively established by the record evidence and adverse inferences the Court draws from Mr. Cartwright's invocation of the Fifth Amendment.

Defendant Cartwright is listed as the president of Transnet on the Florida Business Opportunity Act filing application, the Franchise Rule disclosure document, the Plantation, Florida, business license application form, and Transnet's website.  He is a signatory on Transnet's bank account, where he is listed as president.  Like Farris Pemberton, Defendant Cartwright signed initial letters to prospective purchasers as president of Transnet, making claims about enjoying financial freedom.   He also  responded to one or more consumer complaints as President of Transnet, denying requests for refunds.   As such, Defendant Cartwright is liable for the deceptive acts and practices of Transnet.

Based on the factual record before the Court, and absent any objection or contrary assertion by Defendants, the Court concludes that the total amount money defrauded from consumers equals $48,117,765.49.  As discussed in greater detail earlier in this order, Transnet's sales after refunds equals $17,447,409.00 and Nationwide's deposits after refunds equal $30,908,752.66.  Defendants do not dispute either of these amounts asserted in Plaintiff's Statement of Facts.  Accordingly, based on the evidence provided by Plaintiff, the profit and loss

spreadsheet of Transnet and various deposits slips of Nationwide on official bank records, the Court accepts these numbers as the total amount of consumer damages.  The Court finds it appropriate to order complete restitution in order for the defrauded consumers to be returned to the status quo. The amount Defendants defrauded consumers is $48,117,765.49 and that is the amount of consumer redress Defendants must now pay.

Corporate Defendant Transnet and individual Defendants Paul Pemberton and Bradley Cartwright are jointly and severally liable in the amount of $17,447,409.00.  Corporate Defendant Nationwide and individual Defendants Paul Pemberton and Farris Pemberton are jointly and severally liable in the amount $30,908,752.66.

Further, the individual Defendants Paul Pemberton, Farris Pemberton, and Bradley Cartwright are subject to injunctive relief.  ""[I]t is entirely reasonable for the Commission to frame its order broadly enough to prohibit petitioner's use of identical illegal practices for any purpose, or in conjunction with the sale of any and all products." *Carter Prods. v. FTC,* 323 F. 2d 523, 533 (5th Cir. 1963)(quoting *Niresk Industries Inc. v. FTC*, 278 F. 2d 337, 342-43 (7th Cir.), *cert. denied*, 364 U.S. 883 (1960)).[8]  Individual Defendants Paul Pemberton, Farris Pemberton, and Bradley Cartwright are prohibited from engaging in certain business activities regarding business opportunity ventures as specified in this Court's Final Order.

## D.  Relief Defendant

The legal principle of a Relief Defendant has its genesis in common law and has been

---

[8]     The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.  *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

fully developed in the SEC context.  In *SEC v. Cavanagh*, 155 F. 3d 129, 136 (2d Cir. 1998), the

Second Circuit held that federal courts may order equitable relief against a 'nominal' or 'relief'

defendant, an individual who is not accused of wrongdoing, where that person has "(1) received

ill-gotten funds; and (2) does not have a legitimate claim to those funds."  *Id* (citing *SEC v.*

*Colello*, 139 F.3d 674, 677 (9th Cir. 1998)).  This rationale has been transplanted into the FTC

arena by the Fourth Circuit in  *CFTC v. Kimberlynn Creek Ranch*, 276 F. 3d 187, 191 (4th Cir.

2002)).  The Fourth Circuit acknowledged it was the first attempt to obtain relief from a nominal

defendant in an FTC action for commodities fraud, but saw no reason not to extend the

justification from the SEC context quoting *Colello*: "The federal courts can be employed to

recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original

wrongdoer or by one who has received the proceeds of the wrong."  *Id.* at 192 n. 4 (quoting

*Colello*, 139 F.3d at 676).  In *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind.

2000), the court explained that "it is just as important to discourage illegal conduct by taking the

proceeds of that illegality from those who have given no current value for the ill-gotten gains that

have been turned over to them (even though they themselves have not directly engaged in the

illegal activity) ."  *Id.* at 1020.

     Here, Margaret Pemberton received over $1.3 million directly from Transnet and

Nationwide and an additional $300,000 from the account of Cartwright Consulting, an account

through which Transnet paid Bradley Cartwright.   Nothing on the record indicates that she had a

legitimate claim to the funds; Margaret Pemberton did not provide any services to either

company to warrant the payments.  Plaintiff has stated as much in its Statement of Facts, and

Defendants have submitted no evidence to refute this.  (P. Statement of Facts ¶¶ 83, 84.)

Therefore, the Court finds that Margaret Pemberton, as a relief defendant, must pay to the FTC $1.6 million as further specified in this Court's Final Order.

## IV.    Conclusion

It hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Summary Judgment (**DE 89**) is **GRANTED** in whole as follows:

1) There does not exist a genuine issue of material fact as to whether Defendants Transnet, Nationwide, Paul Pemberton, Farris Pemberton, and Bradley Cartwright violated Section 5 of the FTC Act.  As a matter of law, Defendants Transnet, Nationwide, Paul Pemberton, Farris Pemberton, and Bradley Cartwright violated Section 5 of the FTC Act.

2) There does not exist a genuine issue of material fact as to whether Defendants Transnet, Nationwide, Paul Pemberton, Farris Pemberton, and Bradley Cartwright violated the Franchise Rule.  As a matter of law, Defendants Transnet, Nationwide, Paul Pemberton, Farris Pemberton, and Bradley Cartwright violated the Franchise Rule.

3) There does not exist a genuine issue of material fact as to whether Defendants Paul Pemberton, Farris Pemberton, and Bradley Cartwright are individually liable for violations of Section 5 of the FTC Act and the Franchise Rule.  As a matter of law, Defendants Paul Pemberton, Farris Pemberton, and Bradley Cartwright are individually liable for violations of Section 5 of the FTC Act and the Franchise Rule.

4) Corporate Defendant Transnet and individual Defendants Paul Pemberton and Bradley Cartwright are jointly and severally liable in the amount of $17,209,012.83.  Corporate Defendant Nationwide and individual Defendants Paul Pemberton and Farris Pemberton are jointly and severally liable in the amount $30,908,752.66.

41

5)  There does not exist a genuine issue of material fact as to whether Defendant Margaret Pemberton is liable for $1,600,000 as a Relief Defendant. As a matter of Law, Defendant Margaret Pemberton is liable for $1,600,000 as a Relief Defendant.

6) Plaintiff's Motion in Limine For Admission fo Consumer Complaints (**DE 94**) is **DENIED.**

7) Plaintiff's Motion in Limine Concerning Drawing Adverse Inferences **(DE 93)** is **GRANTED.**

8) Plaintiff's Substitute Motion to Accept Plaintiff's Final Judgments and Order**s** for Permanent Injunction (**DE 121)** is **GRANTED.**

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 20th day of March, 2007.

_____

Hon. Kenneth A. Marra
United States District Court Judge

Copies furnished to:
All counsel of record


Defendant Bradley Cartwright, *pro se*
103 Dockside Circle
Weston, FL 33327


Paul Pemberton, *pro se*

8150 Cleary Blvd.
Apt No. 1506
Plantation, FL 33327


Farris Pemberton, *pro se*

1088 Veterans Drive
Ashland, TN 37015

42

Margaret Pemberton, *pro se*
114 Dockside Circle
Weston, FL 33327